UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LISA HASKINS,

        Plaintiff,

v.                                        Case No.14-C-1470

CAROLYN COLVIN,

        Defendant.

## DECISION AND ORDER

Plaintiff filed this action challenging the decision of the Commissioner of Social Security denying her disability benefits. For the reasons given below, the decision of the Commissioner will be affirmed.

**I. Background**

Plaintiff suffers from a number of mental health issues, which she alleged were exacerbated by the suicide of her son in 2007. These include depression, which has resulted in suicidal ideation and a suicide attempt, as well as ADHD, anxiety and borderline personality disorder. Over the years she held a number of different jobs, including as a waitress, but these seldom lasted very long due to personality issues, panic attacks, and other workplace conflicts, including what the Plaintiff described as harassment. On one occasion, she alleged, a lawyer at a law firm attempted to have her sign a contract agreeing to have sex with him and to allow him to spank her. (R. 503.)

Treatment notes from 2007 and 2008 indicate an individual with ADHD, marital problems, and difficulties coping with the death of her son. (R. 445-47.) At her lowest point, she indicated

planning her own funeral because she wanted to be with her son so badly. (R. 447.) In August 2007, just two months after the suicide, she was deemed to be "profoundly depressed" and a "severe" risk of suicide herself. (R. 447-48.) She was assessed a global assessment of functioning (GAF) score of 30-40.

In 2009-2012, however, she appeared to have been much improved, receiving treatment only for her ADHD, which was controlled with Vyvanse and Adderall. (R. 450-54.) In 2009 she received a perfect score on an exam in Indian law. (R. 464.) Although she still experienced some PTSD symptoms due to the death of her son, "her mood for the most part has been good." (R. 464.) In 2010 she reported feeling "good," and had a desire to attend law school. (R. 462.) In an appointment with a psychiatric nurse, she expressed some anxiety about her husband's behavior but felt better after the counseling session. The nurse assigned a GAF score of 70. (R. 458-59.)

In February 2012, the Plaintiff underwent a psychological exam with Dr. DuBord. (R. 425-29.) The psychologist noted problems with borderline personality disorder, as well as the Plaintiff's dramatic and emotional presentation, possibly due in part to the fact that she had not taken her Adderall prior to the second of the two exam appointments. (R. 426.) The examiner concluded that "without treatment, it appears unlikely that Ms. Haskins would be able to succeed either on a job or in college." (R. 428.)

In 2013 Plaintiff underwent another consultative psychological exam, this time with Dr. Schedgick. The exam was remarkable, in the psychologist's view, for the Plaintiff's grossly inappropriately sexual dress, as well as for her noticeable lack of effort on several tasks. (R. 502-17.) Dr. Schedgick questioned many of her assertions, including that she was experiencing physical pain and hallucinations or flashbacks, and he noted that she had been "evasive" in several segments

2

of the interview. Dr. Schedgick ultimately viewed her has having the ability to carry out tasks, understand directions, and otherwise work appropriately in a normal work setting, although he noted that her "personality features" might pose an obstacle. (R. 516-17.) He assigned a GAF score of 75-80.

Two state agency psychologists reviewed the record and concluded the Plaintiff has the ability to work. (R. 105-107.) They found that the Plaintiff would be able to follow instructions and perform up to employment expectations so long as she had minimal contact with others in the work setting. (R. 105, 141.) They also found that the Plaintiff's statements regarding the severity of her symptoms was only partially credible in light of the whole record. (R. 139.)

The ALJ concluded that the Plaintiff has only mild restrictions in daily living: for example, she lives alone and was able to obtain a college degree, get a paralegal certificate, and an internship in Washington, DC. (R. 15.) In social functioning, she has moderate difficulties. As the consulting examiner found, if she desired to behave appropriately around co-workers, she could. (R. 515.) The ALJ also concluded that Plaintiff's personality disorder could interfere with her ability to maintain an adequate pace. Ultimately, the ALJ found the Plaintiff retained the ability to perform a full range of work, so long as the work involved simple, routine tasks, limited contact with other co-workers or the public, and minimal changes in routine. (R. 16.) The work also must not be at an assembly-line pace. (*Id.*)

## II. Analysis

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a

3

reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007).

**A. Dr. Schedgick's Opinion**

The Plaintiff first argues that the ALJ erred by relying on Dr. Schedgick's statements to the effect that the Plaintiff could deal with work situations "if she chose." (R. 14, 516-517.) In the Plaintiff's view, the ALJ's error was in believing that Plaintiff's limitations were a matter of choice—she simply had a bad attitude, in common parlance—when in fact Dr. Schedgick repeatedly noted that her "personality features" played a significant or even dominant role in her behavior. In short, the Plaintiff argues that her difficulties getting along with others and holding a job were not a matter of choice but a product of her personality disorders.

There are a number of problems with this argument. First, Dr. Schedgick's lengthy report does not give the impression that the Plaintiff is irretrievably barred by a mental disorder from conducting herself appropriately in the workplace. Although her behavior was clearly influenced by "personality features," Dr. Schedgick repeatedly expressed the view that she could make adequate judgments "if she wishes to" and respond to coworkers or the public "if she wishes to." (R. 516-17.) These statements suggest that the Plaintiff was in control of herself; as Dr. Schedgick put it: "She can follow a routine and schedule if she wishes to do so. Her personality features may make this difficult." (R. 516.) Read in context, this means that given her personality features, it might be "difficult" for her to make appropriate choices in a workplace setting, but not impossible or unlikely. Of course, almost every person has negative "personality features," and these are the traits that make us lazy, cowardly, dishonest, arrogant, impulsive, and rude—the list of human foibles is nearly endless. But, for the most part, individuals are not defined by, nor are they captive

4

to, these personality features. For that reason, a lazy man is not deemed disabled simply because he finds it hard to get out of bed every day, and neither is an arrogant boor who gets fired from every job because he instigates fights. Here, Dr. Schedgick was explaining that the Plaintiff has the ability to succeed in the workplace so long as she controls the personality features that are holding her back. The ALJ did not misread the report, as Plaintiff suggests. He correctly interpreted the report as supportive of Plaintiff's ability to work. (The quite high GAF score Dr. Schedgick assigned also reflects this.)

The ALJ's reading of Dr. Schedgick's report is supported by the fact that both state agency psychologists reached similar conclusions about it. The first consulting psychologist gave Dr. Schedgick's report "great weight" and concluded that the Plaintiff had adequate cognitive abilities and moderate social limitations. (R. 103.) She also concluded that the record supported the conclusion that the Plaintiff could perform adequately in a work setting so long as she had minimal contact with others. (R. 105.) The second consulting psychologist concurred, also giving Dr. Schedgick's opinion great weight. (R. 139.) As noted above, both psychologists concluded the Plaintiff would be capable of work with limitations on social contact. Since both gave Dr. Schedgick's opinion great weight, and since both concluded that the Plaintiff had the ability to work, one must conclude that they read the opinion just as the ALJ did, meaning they did not ascribe the same limiting meaning to his comments about "personality features" that the Plaintiff does. Both consulting psychologists have doctorates in psychology, and therefore the ALJ was entitled to rely on their reading of Dr. Schedgick's report.

**B. Credibility**

"So long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin,* 778 F.3d 645, 651 (7th Cir. 2015). Plaintiff argues, in cursory fashion, that the ALJ erred by discounting her credibility based on the report from Dr. DuBord. Among other things, Dr. DuBord administered the MMPI-2 personality test. He indicated, however, that the Plaintiff "invalidated the results by generating an 'all deviant' response set. That is, she answered all items like the criterion group for each scale, resulting in a profile suggesting global psychological distress. It is not possible to differentiate the validation of the various scales with such a response set." (R. 427.)

The ALJ found, based on the "all deviant" responses Plaintiff gave on the exam, that the Plaintiff "actively attempted to portray herself as more mentally impaired than she actually is while taking the MMPI-2." (R. 16.) Plaintiff argues that Dr. DuBord had not found any deception on her part and thus the ALJ erred by interpreting the test as suggestive of deceit. But the ALJ's reading of the test report is a reasonable one, and not patently erroneous. Dr. DuBord indicated, in essence, that Plaintiff's answers on the exam did not make sense because her answers were indicating "global psychological distress" when in fact that was not the case. Having answered a personality examination in a way that was suggestive of such "global" dysfunction that the examiner threw out the results, the Plaintiff cannot be surprised that the ALJ viewed that event as indicative that she was an unreliable source of reporting about her limitations. Combined with her evident lack of effort in her exam with Dr. Schedgick the following year, and the other factors the ALJ cited, the ALJ was entitled to conclude that the Plaintiff was not a fully reliable source of information about her condition.

6

**C. Ellen Pritchard**

Once again, the Plaintiff's argument on this point is so cursory that it could be disregarded. In the interest of completeness, however, it will be addressed. The Plaintiff's friend, Ellen Pritchard, submitted a three-page declaration indicating, among other things, that the Plaintiff had a "full-blown mental illness" due to her hostility to others, seeing things that weren't there (spirits and ghosts), and excessive concern with bathing and dressing, which frequently made her late for appointments. (R. 639-41.)

The ALJ noted Pritchard's declaration but gave it no weight in light of the fact that Pritchard was not a mental health professional and there was no information that would indicate her opinion was credible, particularly since it went against the weight of the state agency consultants and Dr. Schedgick. (R. 15.) To the extent Pritchard opined that the Plaintiff had mental illness, had panic attacks, and needed certain medications, the ALJ was correct to give the opinion no weight given Pritchard's lack of expertise on the subject.

But Pritchard also testified about certain facts—the observations that gave rise to her opinion that the Plaintiff had a mental illness—and the ALJ appears to have missed the fact that Pritchard was a person who had known the Plaintiff for 35 years and talked to her almost every day. (R. 639). (The ALJ remarked, "it is unclear who this person is" despite the explanation in the declaration itself.) The fact that she was not a mental health professional does not mean all of her observations may be disregarded. Even so, Pritchard's observations would not support a finding of disability because they essentially echo what was already addressed by the mental health experts. For example, she indicates "the most disruptive [trait] to her ability to work is her hostility." (R. 639.) This makes it difficult for her to hold jobs, and to live with her ex-husband or others. In addition,

7

she spends excessive time bathing or on her appearance, which makes her chronically late. "It is hard for me to imagine that anyone would hire Lisa to work, given all these issues. The hostility seems most likely to keep her from working . . ." (R. 641.) But this dovetails (as Plaintiff herself argues) with the opinion of Dr. Schedgick, whose point was that she would face difficulties working due to her personality features, including hostility. But hostility on its own is not a mental illness, it is a behavior, and again we return to Dr. Schedgick's conclusions that she could overcome her tendencies "if she wishes to." (R. 515-16.) In short, Pritchard's testimony did not add anything that was not already considered.

**D. Vocational Expert Testimony**

To account for the limitations due to Plaintiff's mental illness, the ALJ's RFC included limitations precluding the Plaintiff from contact with the public and more than occasional contact with co-workers. The Plaintiff argues, however, that the ALJ did not include a limitation in his question to the vocational expert regarding the Plaintiff's difficulties in handling aggression or emotional distress. But this argument is premised on the Plaintiff suffering from the disabling conditions she *claims*, rather than the ones the ALJ properly found. As noted above, the ALJ relied on the state agency consultants and Dr. Schedgick's conclusion that many of the Plaintiff's problems were within her own control. The state agency consultants imposed limitations on interactions with the general public and coworkers, which the ALJ adopted. No medical source indicated the specific issues the Plaintiff now cites, and in any event presumably they would be accounted for through the limitation on contact with co-workers and the public.

8

Case 1:14-cv-01470-WCG   Filed 02/03/16   Page 8 of 9   Document 12

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is affirmed.

**SO ORDERED** this 3rd day of February, 2016.

                                                        /s William C. Griesbach
                                                        William C. Griesbach, Chief Judge
                                                        United States District Court